UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CNH CAPITAL AMERICA LLC                                                          PLAINTIFF

v.                                                          CIVIL ACTION NO. 3:10-CV-350

HUNT TRACTOR, INC., *et al.*                                                    DEFENDANTS

## MEMORANDUM OPINION

Plaintiff CNH Capital America, LLC ("CNH") brings this action to recover monies defendant Hunt Tractor, Inc. ("Hunt Tractor") owes to CNH pursuant to a Wholesale Financing and Security Agreement (the "WFSA"). Along with suing Hunt Tractor for breach of contract, CNH has also sued Hunt Tractor shareholders W. Scott Hunt, Jr. ("Scott Hunt") and Dominic Pagano ("Pagano"). CNH alleges a variety of claims in an attempt to impose liability on those individuals. CNH, Scott Hunt, and Pagano have all moved for summary judgment as to various of CNH's claims. For the reasons herein, the court will grant in part and deny in part CNH's motion, deny in full Scott Hunt's motion, and grant in full Pagano's motion. As a result of the court's resolution of those motions, judgments will be entered against Hunt Tractor and Scott Hunt in the amount of $1,815,487.99, but all claims against Pagano will be dismissed with prejudice.

## I.

Hunt Tractor was a construction equipment dealership which sold Case brand equipment. In 1991, Hunt Tractor entered into the WFSA with Case Credit Corporation, the corporate predecessor of CNH. Pursuant to that agreement, CNH financed Hunt Tractor's acquisition of Case inventory and equipment. In exchange, Hunt Tractor granted CNH a security interest in, among

other things, all inventory and equipment financed by CNH and all proceeds of the inventory. CNH made multiple UCC filings with the Secretary of State of Kentucky to perfect its security interests.

In 2007, Scott Hunt sought to purchase Hunt Tractor from members of his family. To that end, in early 2007, Scott Hunt approached Pagano, his father-in-law, about financing the purchase. Pagano, who was sophisticated businessman,[1] agreed to help Scott Hunt by lending $400,000 to Hunt Tractor to accomplish a reorganization that would leave Scott Hunt with a controlling share of the corporation. Scott Hunt became the owner and new President of Hunt Tractor.

Thereafter, Hunt Tractor sought to be re-certified as a dealer of Case equipment. As part of its Case dealership re-certification application, Hunt Tractor submitted an organizational chart to CNH that listed Pagano as the Chairman of the Board. However, according to Pagano and Scott Hunt, Pagano told Scott Hunt that he did not want to be involved in the management of Hunt Tractor and he never had any formal title or management duties for the company. To help Hunt Tractor be certified as a Case dealer, Pagano converted his $400,000 loan to Hunt Tractor into equity in the company so that Hunt Tractor would meet CNH's minimum equity requirements.[2] Additionally, CNH had Scott Hunt sign a guaranty stating that he "guarantee[d] the payment and performance when due . . . of all present and future obligations and indebtedness of [Hunt Tractor] to [CNH] arising under the Financing Agreements or otherwise."

In early 2008, after Hunt Tractor was certified as a dealer, Pagano put Hunt Tractor in contact with Commonwealth Bank and Trust Company ("Commonwealth") to discuss securing a

---

[1] Pagano was the President and CEO of a corporation that was publically-traded on the NASDAQ, had previously founded and then been President and CEO of another corporation, and had also been a founder and member of the Board of Directors of a Connecticut Bank.

[2] According to CNH, Pagano owned 46% of the stock in Hunt Tractor.

line of credit and a term loan from the bank. In March of 2008, Commonwealth approved Hunt Tractor for a $500,000 line of credit and a $600,000 term loan. The term loan had a maturity date of March 27, 2018. The line of credit had a term of one-year; Hunt Tractor ultimately renewed the line of credit for a term ending May 13, 2010. The loan analysis attached to the approval noted that Hunt Tractor was "owned and operated" by Pagano and Scott Hunt.

For the line of credit loan, Pagano and Scott Hunt both signed guaranty agreements, and Pagano signed an agreement to give Commonwealth a security interest in a personal securities account Pagano maintained with Commonwealth. For the term loan, Pagano signed another agreement granting Commonwealth a security interest in his securities account. Pagano was required to maintain at least $715,000 in assets in the securities account for the line of credit loan and $857,200 in assets for the term loan. Pagano transferred sufficient amounts of stock into his Commonwealth securities account in order to meet his obligations. Thereafter, whenever the value of the stock in the securities account fell below the requisite levels, Pagano would transfer assets into the account to bring the value back up to the requisite level.

In early 2009, Hunt Tractor was having cash flow difficulties and needed a cash infusion to meet payroll and other obligations. Pagano invested $170,000 in three installments between February and April.[3] In May of 2009, CNH renewed Hunt Tractor's wholesale credit account with a credit limit of $5,000,000. However, just two months later, representatives of Hunt Tractor and CNH met to discuss Hunt Tractor's repeated requests for extensions of time to pay certain debts. At that meeting, the parties came to an agreement: CNH agreed to a forbearance on payments from Hunt Tractor for Hunt Tractor's rental fleet, while Hunt Tractor agreed to liquidate $1,500,000 in

---

[3] There is no documentation concerning whether Pagano's investments in 2009 were loans, equity purchases, or otherwise.

rental inventory over the following two months. Hunt Tractor was also required to increase its working capital line by $500,000.

In September of 2009, Pagano made another investment in Hunt Tractor, for $55,000, believing that despite Hunt Tractor's troubles, it could become profitable. For that investment, Pagano required that Scott Hunt give Pagano a second mortgage on his home.

Meanwhile, Pagano and Scott Hunt were continuing to speak with representatives of CNH concerning Hunt Tractor's debt service obligations. Pagano claims that at one point, he suggested a "lockbox" agreement whereby Hunt Tractor would deposit proceeds from its business into an account over which CNH would have the right to approve disbursements, but CNH declined. Then, at a meeting on September 23, 2009, Scott Hunt and Pagano acknowledged to CNH that Hunt Tractor might have to liquidate its business due to Hunt Tractor's inability to meet CNH's requirement that it increase its working capital line by $500,000 and the fact that Hunt Tractor projected a $300,000 cash shortfall during the following six months.[4]

On October 13, 2009, Pagano and Scott Hunt met with Phil Cooper, a representative of Commonwealth, for lunch. According to Pagano, the reason for the meeting was for Hunt Tractor to attempt to secure additional working capital from Commonwealth, but Commonwealth would not do so without additional guaranties from Pagano, which Pagano would not give. Indeed, not only would Pagano not give additional guaranties, he asked Cooper during the lunch meeting about the mechanics of revoking his earlier guaranty. Cooper told Pagano that if he withdrew his guaranty, Commonwealth would immediately demand that Hunt Tractor fully pay off the line of credit or find

---

[4] Commonwealth would not increase Hunt Tractor's line of credit unless Pagano pledged additional assets, which he was unwilling to do. Pagano also would not invest any more cash into to Hunt Tractor so that it could meet its projected cash shortfall.

a replacement guarantor, and Pagano would be liable as guarantor for any balance until one of those options was completed. After the meeting, Cooper sent Pagano and Scott Hunt a sample close out letter that could be used to pay off the line of credit.

Meanwhile, in early October, Hunt Tractor completed a large sale of Case construction equipment to the Kentucky Department of Transportation ("Kentucky DOT"). For that sale, Hunt Tractor was to receive $825,347 in proceeds. On Monday, November 9, 2009, Hunt Tractor received a check from the Kentucky DOT for that amount, which it deposited into its Commonwealth checking account on November 12, 2009.

On the evening of November 12, 2009, Pagano sent an email to Cooper that read as follows:

Phil;

I have tried several times to reach in in [sic] regard to our agreement to have my guarantees removed from the Hunt Tractor term note and WC line of credit.

On Tuesday we had agreed that by the end of the day today you were going to forward me the payoff amount for the term note. You were also were to send along with any required documents to affectively remove my personal guarantees.

Consequently, effective immediately, once the revolving WC line is sweept down to zero, please close it out and do not advance any funds.

In the morning, please forward the pay off amount for the term note and also prepare all necessary documents that will release my personal collateral.

I am flying on to Louisville this evening and plan to be at your office at 9:30 in the morning (Friday November 13th).

Thank you for your attention to this matter.

Regards,

Dominick

(errors in original). The following morning, Cooper emailed Pagano payoff figures. In addition, Cooper sent a letter to Scott Hunt via email and mail. In the letter to Scott Hunt, Cooper reproduced the email he received from Pagano and further stated:

> I have attached payoff and close out letters for you and your guarantor; per his request.
>
> If you wish to continue to have a credit relationship with Commonwealth Bank it is imperative that we receive notification from Mr. Pagano within 48 hours stating that he is willing to continue to guarantee the debts of Hunt Tractor.

Cooper also sent a letter to Pagano with a copy of the letter he sent to Scott Hunt enclosed. The letter to Pagano stated:

> It is important to note that there are currently balances on both the term note and the line of credit and we cannot release you of your guarantee until both have reached a zero balance and closed. Once this happens we will absolve you of your guarantee and within 30 days release any collateral that we have securing these obligations.

That same day – Friday, November 13, 2009 – Commonwealth swept $348,998.26 from Hunt Tractor's account to pay off the line of credit. Scott Hunt signed an authorization to close the line of credit and release any security interest, which stated that Hunt Tractor could not find a guarantor within 48 hours.

On November 16, 2009, Hunt Tractor remitted a check for $501,549.87 to Commonwealth as payment on the term loan. The following day, Hunt Tractor paid the remainder of the balance on the term loan, which was $27,089.77. At 6:52 a.m. on November 18, 2009, the day after the term loan's balance was paid in full, Pagano emailed Cooper requesting that his pledged assets be released; Cooper replied that Commonwealth would forward to Pagano all collateral releases and a copy of the promissory note stamped "paid in full" within 14 days.

In his deposition, Pagano maintained that he did not know that Hunt Tractor was going to use the Kentucky DOT funds to pay off the term loan and was "pleasantly surprised" when they did so. On the other hand, Scott Hunt believed that Pagano was awaiting the Kentucky DOT payment before he withdrew his guaranties.

According to Mike Litke, a Territory Credit Manager at CNH who was responsible for the Hunt Tractor account, Scott Hunt called him on November 18, 2009 and stated that Hunt Tractor received $825,347 in proceeds for the sale of equipment to the Kentucky DOT. However, Scott Hunt informed Litke, Pagano had revoked his guaranty of Commonwealth's loans to Hunt Tractor and Commonwealth "took the money" that Hunt Tractor received from the Kentucky DOT. CNH determined that Hunt Tractor was in default under the WFSA, and Hunt Tractor's dealership agreement with Case and CNH was terminated.

CNH filed this action against Hunt Tractor, Scott Hunt, and Pagano. CNH brought a claim against Hunt Tractor for breach of contract, a claim against Scott Hunt for breach of guaranty, and a claim against Pagano for breach of contract (based on a piercing the corporate veil theory). It also brought claims against both Pagano and Scott Hunt for breach of fiduciary duty, fraudulent concealment, conspiracy to commit fraud, preferential conveyance, conspiracy to make a preferential conveyance, fraudulent conveyance, conspiracy to make a fraudulent conveyance, conversion, and punitive damages.

CNH has moved for summary judgment as to the breach of contract claim against Hunt Tractor, the breach of guaranty claim against Scott Hunt, and the fraudulent conveyance and conversion claims against Pagano. Scott Hunt has cross-moved for summary judgment on the breach of guaranty claim. Pagano has moved for summary judgment as to all claims against him.

## II.

To prevail on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is sufficient evidence on which the jury could reasonably find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue does not need to be resolved conclusively in favor of the non-moving party, but that party must present sufficient probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968). The evidence must be construed in the light most favorable to the non-moving party. *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

## III.

### A. Breach of Contract - Count I

CNH seeks summary judgment as to its breach of contract claim against Hunt Tractor, and requests damages amounting to $1,815487.99. To prove a breach of contract claim, "a plaintiff must show the existence and the breach of a contractually imposed duty." *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). It is undisputed that CNH and Hunt Tractor were parties to the WFSA. Additionally, Hunt Tractor has admitted that it defaulted under the WFSA (DN 80, Amended Answer ¶ 7). Accordingly, summary judgment is warranted as to Hunt Tractor's liability for breach of contract.

In support of its request for $1,815,487.99 plus interest, CNH submitts an affidavit of Mike Litke, the Territory Credit Manager at CNH responsible for Hunt Tractor's account, stating that the requested amount was what Hunt Tractor owed to CNH as of April 13, 2012 "after all due credits

were applied to the WFSA obligations." CNH also submits a chart with a more detailed breakdown of the amounts CNH argues it is due under the WFSA. Finally, CNH submits a copy of the most recent Hunt Tractor Dealership Statement.

While Hunt Tractor did not contest its liability for breach of contract, it does contend that there is a factual question concerning the amount of damages. In particular, Hunt Tractor contends that CNH did not dispose of Hunt Tractor's collateral in a commercially reasonable method. In support of its argument, Hunt Tractor submits an affidavit of Scott Hunt, in which he critiques Hunt Tractor's method of disposition of the secured assets. According to Scott Hunt, CNH received approximately 1/3 of the actual value of the collateral and "far less than the debt which it secured."

Kentucky has adopted the Uniform Commercial Code ("U.C.C.") to govern secured transactions. Thus, Kentucky law requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." KRS § 355.9-610. A secured party has the burden of establishing that the disposition of collateral was conducted in a commercially reasonable manner. KRS § 355.9-626. However, "[a] secured party need not prove compliance with the provisions . . . relating to . . . disposition . . . unless the debtor or a secondary obligor places the secured party's compliance in issue." *Id.*

CNH argues that it need not prove commercial reasonableness because Hunt Tractor did not raise the issue until its response to CNH's motion for summary judgment. CNH states that it sent Hunt Tractor, as well as Scott Hunt personally, a notification of private disposition of collateral dated January 13, 2010. The notification stated that CNH was owed $3,775,816.28 and that, pursuant to the U.C.C. and the WFSA, CNH planned to sell collateral owned by Hunt Tractor "privately sometime after February 2, 2010." It further stated that the collateral would be sold "AS

IS WHERE IS," without any sort of warranties. The notification provided that Hunt Tractor could contact Litke for more information about the sale.

Four months later, in May of 2010, CNH filed its complaint against Hunt Tractor, Scott Hunt, and Pagano. In paragraph 86 of the complaint, CNH alleged that the remaining balance owed by Hunt Tractor was $2,820,132.66, plus interest and fees. In paragraph 87, CNH alleged:

> CNH is "currently liquidating all remaining Secured Assets, the net proceeds of which will be applied to the WFSA balance. A Notification of Private Disposition was sent to Hunt Tractor and [Scott] Hunt on or about January 13, 2010."

Hunt Tractor and Scott Hunt filed a joint answer in which they stated that they were without sufficient information to admit or deny the allegation that Hunt Tractor owed over $2.8 million to CNH. They did, however, admit the allegations in paragraph 87 concerning CNH's liquidation of the remaining secured assets.[5] Hunt Tractor and Scott Hunt never made any allegation in their answer that CNH's liquidation of secured assets was being done in a commercially unreasonable manner. As to their affirmative defenses, Hunt Tractor and Scott Hunt pled "unclean hands, laches, estoppel, waiver, accord and satisfaction and statute of frauds."

Discovery in this matter closed on January 15, 2012. CNH filed its motion for partial summary judgment on April 16, 2012. Hunt Tractor and Scott Hunt filed a joint response to CNH's motion on April 26, 2012. According to CNH's reply papers, that response was the first time that any party has suggested that CNH did not dispose of the assets in a commercially reasonable manner. Hunt Tractor and Scott Hunt have not provided the court with any argument that they raised it at an earlier time, so as to put CNH on notice that the commercial reasonableness of the manner in which it disposed of the secured assets was in dispute.

---

[5] On July 18, 2011, Hunt Tractor and Scott Hunt filed an amended answer, but did not change any portion relevant to this discussion.

Federal Rule of Civil Procedure 8(c)(1) required any defendant who wished to raise the commercial reasonableness defense to plead the defense in its responsive pleading. That Rule requires that a party "affirmatively state any avoidance or affirmative defense," of which the Rule lists many non-exclusive examples. As a general matter, Rule 8(c)(1) pertains to two types of defensive allegations: "those that admit the allegations of the complaint but suggest some other reason why there is no right of recovery, and those that concern allegations outside of the plaintiff's prima facie case that the defendant therefore cannot raise by a simple denial in the answer." 5 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1271 (3d. ed. 2004). The former of those two categories encompasses Hunt Tractor and Scott Hunt's argument concerning the reasonableness of the disposition of assets. It is a defense that admits the allegations, in that it admits that Hunt Tractor and Scott Hunt owed CNH money under the contract, but suggests another reason why CNH could not recover: the failure of CNH to have disposed of secured assets in a commercially reasonable manner.

The court finds support for its determination that Hunt Tractor and Scott Hunt were required to raise the commercial reasonableness issue in their answer in the official comment to KRS § 355.9-626 (and to U.C.C. § 9-626, on which the Kentucky statute is mirrored). In relevant part, the official comment states:

> **Rebuttable Presumption Rule.** . . . [T]he secured party need not prove compliance with the relevant provisions of this part as part of its prima facie case. If, however, the debtor or a secondary obligor raises the issue (in accordance with the forum's rules of pleading and practice), then the secured party bears the burden of proving that the . . . disposition . . . complied.

The official comment's reference to the "rules of pleading and practice" suggests that "plac[ing] the secured party's compliance in issue" means pleading such a defense in an answer, at least in a system that employs a pleading rule like Rule 8(c)(1).

Further, the commercial reasonableness defense is close kin to a mitigation of damages defense. Both defenses look to the reasonableness of the actions that a damaged party took to limit the amount of damages a defendant may be liable to pay. "Most federal courts . . . regard the failure to mitigate as an affirmative defense under Rule 8(c)'s catchall clause." *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1286 (11th Cir. 2000); *see* 5 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1273 (noting that "matters that tend to mitigate damages" should be pleaded affirmatively since "in essence they introduce new matter into the case").

Ordinarily, an affirmative defense that is not raised in the pleadings is deemed waived. *Gilbert v. Ferry*, 413 F.3d 578, 579 (6th Cir. 2005). However, in exceptional circumstances, a district court may allow an affirmative defense not raised in a responsive pleading to be asserted. *See Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997). The Sixth Circuit has noted that "[t]he purpose of Rule 8(c) of the Federal Rules of Civil Procedure is to give the opposing party notice of the affirmative defense and a chance to respond." *Id.* Accordingly, "[w]here the failure to raise an affirmative defense before summary judgment does not cause surprise or unfair prejudice to the plaintiff, . . . , [a] [c]ourt, in its discretion, may allow the issue to be raised on summary judgment." *United States Fire Ins. Co. v. City of Warren*, 176 F. Supp. 2d 728, 731 (E.D.Mich. 2001) (citing *Smith*, 177 F.3d at 969). The timeliness of the assertion of the affirmative defense may be considered in determining whether it was waived by a failure to raise it in the answer. *See Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 824 (6th Cir. 1990).

- 12 -

Here, the court finds that Hunt Tractor's failure to raise the commercial reasonableness defense at an earlier time precludes its use to defeat summary judgment. CNH provided Hunt Tractor notice of the sale of the secured assets and referred to that sale in the complaint. Hunt Tractor, despite clearly being aware of that sale, failed to raise any issue regarding it until it filed a response to CNH's motion for summary judgment. By that time, nearly two years had passed since the complaint had been filed, and it was three months beyond the deadline to complete discovery. Hunt Tractor has not offered the court any explanation for its failure to raise the issue at some earlier point. To allow Hunt Tractor to interpose the issue at this time would subvert the protections of Rule 8(c) by allowing for a surprise defense to be asserted well after discovery has been completed.

In sum, Hunt Tractor did not timely raise its commercial reasonableness defense and thereby waived it. Thus, summary judgment in favor of CNH is warranted as to liability and damages for the breach of contract claim in Count I.

**B. Breach of Guaranty - Count II**

Both CNH and Scott Hunt have moved for summary judgment as to the breach of guaranty claim against Scott Hunt in Count II of the complaint. CNH requests a judgment for the same amount of damages as it is entitled to from Hunt Tractor under the breach of contract claim discussed above. Scott Hunt argues that the guaranty is unenforceable. He also contends, as did Hunt Tractor, that summary judgment is improper as to the amount of damages CNH requests because the sale of secured assets was not conducted in a commercially reasonable manner.

We begin with the question of the enforceability of the guaranty Scott Hunt signed. The guaranty contains a provision that reads, "This Guaranty shall be governed by, and construed in accordance with, the laws of the State of Wisconsin . . . ." While CNH argues that the choice-of-law

provision in the guaranty should be enforced – and that the guaranty is clearly valid under Wisconsin law – Scott Hunt takes the position that Kentucky law should govern construction of the guaranty and that Kentucky law renders the guaranty unenforceable.

Because this is a diversity jurisdiction case, the choice-of-law rules of Kentucky, the forum state, are used to determine whether to enforce that contractual choice-of-law provision. *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (2000). We begin with the Kentucky Supreme Court's 1982 decision in *Breeding v. Massachusetts Indem. & Life Ins. Co.*, 633 S.W.2d 717 (Ky. 1982). In that case, there was a dispute concerning an insurance policy that was purchased by Mr. Breeding, a Kentucky resident, when he rented a car in Louisville, Kentucky from Huber's Inc., a Kentucky corporation d/b/a Budget Rent-A-Car. *Breeding*, 633 S.W.2d at 718.  The policy had a choice-of-law provision "expressly stating that the policy was to be governed by the laws of the state of delivery of the policy." *Id.* at 719. Ultimately, the master insurance policy was delivered to Budget Rent-A-Car of America in Delaware. *Id.* at 719.  The Kentucky Supreme Court found that the interpretation of the policy was to be controlled by Kentucky law, not Delaware law. *Id.* at 719. In doing so, the court applied the "most significant relationship" test set forth in section 188 of the Restatement (Second) of Conflict of Laws. *Id*. The Kentucky Supreme Court held: "It is patently obvious that Kentucky has the greater interest in and the most significant relationship to this transaction and the parties. The insurance was purchased in Kentucky by a Kentucky resident from a Kentucky corporation. The claim was initiated by a Kentucky resident, and the claim arose from an accidental death in Kentucky." *Id.*

Eighteen years later, in *Wallace Hardware*, 223 F.3d 382, the Sixth Circuit had occasion to address Kentucky choice-of-law rules. The plaintiff in that case, Wallace Hardware, was a

Tennessee corporation that provided wholesale hardware goods and services to retail hardware stores. 223 F.3d at 386. The defendants were Tri-County Home Center, Inc., a hardware store located in Kentucky, and two brothers, Lonnie and Bill Abrams, who owned and operated the store. *Id.* Both of the Abrams brothers signed an agreement guaranteeing all indebtedness owed by Tri-County to Wallace. *Id.* at 387. The guaranty agreement provided that it was to be governed by Tennessee law. *Id.*

Although the Sixth Circuit noted the "provincial tendency" in Kentucky choice-of-law rules, the Court nevertheless found that the choice-of-law provision in the guaranty agreement signed by the Abrams should be enforced. *Wallace Hardware*, 223 F.3d at 391. The Sixth Circuit distinguished *Breeding* on the ground that in *Breeding* "the [insurance] policy and its choice-of-law clause were not the subject of any negotiations, arms-length or otherwise"; indeed, noted the Sixth Circuit, Mr. Breeding was not even given a copy of the policy and did not know its terms. *Id.* at 393. Moreover, the Sixth Circuit stated, the policy in *Breeding* only provided that it was to be governed by the laws of the state of delivery of the policy, which would not place Mr. Breeding on notice that Delaware law would apply. *Id.* In contrast, in *Wallace Hardware*, the Abrams were represented by counsel in their arms-length dealings with Wallace Hardware and the guaranty agreement plainly stated that Tennessee law would apply. *Id.* at 393-394. The Sixth Circuit stated that given the "crucial differences" in the cases, it "decline[d] to read *Breeding* as dictating that no weight be given to the Guaranty's choice-of-law provision." *Id.* at 394.

Instead, the Sixth Circuit held that in a "standard commercial breach-of-contract case" such as in *Wallace Hardware*, "the Kentucky courts would choose to adopt § 187 of the Restatement as their analytical framework for addressing a contractual choice-of-law clause." *Wallace Hardware*,

- 15 -

223 F.3d at 397. Section 187 of the Restatement (Second) of Conflict of Laws specifically addresses the enforceability of choice-of-law provisions in contracts.[6] The Sixth Circuit then found that under section 187 of the Restatement, the choice-of-law provision in the guaranty agreement signed by the Abrams brothers was enforceable. *Id.* at 398-400.

Since *Wallace Hardware*, courts in this Circuit have applied section 187 of the Restatement when assessing choice-of-law provisions in contracts. *See, e.g.*, *Bank of New York v. Janowick*, 470 F.3d 264, 270 n.3 (6th Cir. 2006); *Casey Wasserman Living Trust Under Declaration of Trust Dated June 29, 1999 v. Bowers*, 2010 WL 3735721, at *3 (E.D.Ky. Sept. 20, 2010); *Vesey Air, LLC v. Mayberry Aviation, LLC*, 2010 WL 716223, at *3 (W.D.Ky. Feb. 24, 2010); *Eaves-Leanos v. Assurant, Inc.*, 2008 WL 80173, at *5 (W.D.Ky. Jan. 8, 2008). And, in one unpublished opinion, the Kentucky Court of Appeals cited *Wallace Hardware* to find that a choice-of-law provision should be applied. *See John Deere Landscapes v. Gagel*, 2006 WL 1953900, at *4 n.9 (Ky. Ct. App. July 14, 2006).

Scott Hunt points out that the Kentucky Supreme Court recently declined to enforce a contract's choice-of-law provision. *Schnuerle v. Insight Commc'ns Co., L.P.*, 376 S.W.3d 561 (Ky. 2012). In *Schnuerle*, the plaintiffs, Kentucky residents, brought a class action against Insight, their internet service provider. 376 S.W.3d at 564. Insight's service agreement, to which each of Insight's

---

[6] Restatement (Second) of Conflict of Laws § 187 provides that a choice-of-law provision in a contract will be enforced unless either (1) the chosen state does not have a "substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (2) the application of the chosen state's law "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state" and "which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." *Wallace Hardware*, 223 F.3d 393 at n.9 (quoting Restatement (Second) of Conflict of Laws § 187(2)).

customers had to agree in order to receive service, contained an arbitration clause and a provision barring class action litigation against Insight. *Id.* The service agreement also contained a choice-of-law provision designating New York law as applicable to the construction of the service agreement. *Id.* at 566. Prior to deciding the enforceability of the arbitration provision and the provision barring class actions, the Kentucky Supreme Court had to determine whether to apply Kentucky or New York law. *Id.* at 566-567. Relying on *Breeding*, the Kentucky Supreme Court held that "Kentucky law should apply because Kentucky had the greater interest in, and the most significant relationship to, the transaction and the parties." *Id.* Scott Hunt suggests that *Wallace Hardware* is no longer good law after *Schnuerle*.

However, the court finds that the Sixth Circuit's holding in *Wallace Hardware* that in a "standard commercial breach-of-contract case . . . the Kentucky courts would choose to adopt § 187 of the Restatement as their analytical framework for addressing a contractual choice-of-law clause" has continuing validity. *Wallace Hardware*, 223 F.3d at 397. Although the Kentucky Supreme Court in *Schnuerle* did not adopt § 187 to analyze the choice-of-law provision at issue in that case, that case did not involve the type of "arms-length business transaction among parties of relatively equal bargaining power" that was involved in *Wallace Hardware*. *Id.* at 394. Moreover, although the Kentucky Supreme Court in *Schnuerle* cited to *Wallace Hardware*, it curiously did so only to support the statement that the merit of the "most significant relationship" doctrine was that "it gives to the forum having the most interest in the problem paramount control over the legal issues arising out of a particular factual context." *Schnuerle*, 376 S.W.3d at 567. In other words, the Kentucky Supreme Court did not address – whether it be to affirm, deny, or put off for decision another day – *Wallace Hardware's* conclusion that Kentucky courts would adopt § 187 of the Restatement when

faced with a choice-of-law provision in a commercial contract made as a result of arms-length negotiations. Given the facts of *Schnuerle*, it had no reason to do so.

Having concluded that *Schnuerle* did not repudiate *Wallace Hardware's* holding on choice-of-law provisions in commercial contracts, the court also concludes that this is a case that falls under *Wallace Hardware*'s purview rather than *Schnuerle*'s. The facts of this case are very similar to those in *Wallace Hardware*. As in *Wallace Hardware*, this case involves a guaranty signed by a majority owner and operator of a business guaranteeing the business's debt to a third-party. And, like in *Wallace Hardware*, the choice-of-law provision in the guaranty at issue here was unambiguous as to which state's law would apply. While Scott Hunt characterizes the guaranty as "a standardized form utilized by CNH," perhaps aiming to suggest that the guaranty was not the subject of arms-length negotiations, the fact is that Scott Hunt, as president and majority shareholder of a long-standing corporation, was a sophisticated businessman who would be well-aware of the importance of the document he was signing. If he disagreed with its terms, he was certainly able to negotiate for a change of those terms or to attempt to find another supplier of inventory and equipment for Hunt Tractor.[7]

Thus, we turn to § 187 of the Restatement. As the Sixth Circuit stated in *Wallace Hardware*:

Under § 187, the parties' choice of law should be honored unless (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or (2) "application of the law of the

---

[7] In *Wallace Hardware*, the Sixth Circuit made note of the fact that the guarantors were represented by counsel. Although there is no indication in the record as to whether Scott Hunt was represented by counsel when dealing with CNH, the fact that he was a sophisticated businessman who undoubtedly understood the importance of the guaranty suggests that if he did indeed fail to retain an attorney, it was his own fault. Therefore, any possible failure to have an attorney review the guaranty is not a reason to decline to enforce the choice-of-law provision in this commercial contract.

chosen state would be contrary to a fundamental policy of a state which has a materially greater interest."

*Wallace Hardware*, 223 F.3d at 398 (quoting Restatement (Second) of Conflict of Laws § 187).

As to the first prong of the § 187 analysis, there is a reasonable basis for the choice of Wisconsin law in the guaranty. Specifically, CNH has a substantial relationship to Wisconsin. It has provided the court with evidence that paperwork from Hunt Tractor concerning payments and dealer statements was to be remitted to a CNH office in Racine, Wisconsin. Additionally, CNH maintains a notice address for its UCC filings in Racine, Wisconsin. In short, CNH does substantial portions of its business in Wisconsin, including those portions relating to Hunt Tractor. Further, the complaint states that, although CNH is a Delaware company with a principal place of business in Illinois, its sole member is CNH Capital LLC, which has its principal place of business in Racine, Wisconsin. In turn, the sole member of CNH Capital LLC is CNH America LLC, which also has its place of business in Racine, Wisconsin. Finally, the sole member of CNH America LLC is Case New Holland, Inc., which, yet again, has its principal place of business in Racine, Wisconsin. Thus, any injury resulting from the default by Hunt Tractor on its contractual obligations to CNH would be felt in Wisconsin by the succession of member companies that own CNH. *See Wallace Hardware*, 223 F.3d at 398.

Turning to the second prong of the § 187 analysis – whether application of the law of the chosen state would be contrary to a fundamental policy of Kentucky – *Wallace Hardware* provides the answer. Scott Hunt argues that the guaranty would be invalid under Kentucky law because the guaranty does not conform to KRS § 371.065(1), which provides:

> No guaranty of an indebtedness which either is not written on, or does not expressly refer to, the instrument or instruments being guaranteed shall be valid or enforceable unless it is in writing signed by the guarantor and contains provisions specifying the

amount of the maximum aggregate liability of the guarantor thereunder, and the date on which the guaranty terminates.

Wisconsin does not have a comparable law. In *Wallace Hardware*, the Sixth Circuit determined that, under the facts of that case, the enactment of KRS § 371.065 was not evidence of a "fundamental" policy in that case. *Wallace Hardware*, 223 F.3d at 399-400. The Sixth Circuit stated that it presumed that the Kentucky statute "is intended to protect against the misuse of superior bargaining power in the context of credit transactions." *Id.* at 399. However, where the evidence shows that a guaranty was the result of an arms-length transaction, and not a contract of adhesion, there is no basis for concluding that Kentucky has a fundamental interest in protecting the guarantor from having to comply with the terms of the agreement. *Id.* at 400. The Sixth Circuit also noted that although the guaranty in that case did not comply with KRS § 371.065, it nevertheless was clear as to what indebtedness the guarantors were agreeing to repay. *Id.* Further, enforcing the choice-of-law provision furthered a different policy of Kentucky: upholding the right of freedom to contract for substantive rights. *Id.*

As noted above, Scott Hunt signed the guaranty as a sophisticated businessman who was well aware of the importance of the document he was signing and the need to read it. As in *Wallace Hardware*, there is no indication in the record that the guaranty is unclear in any way as to what indebtedness Scott Hunt agreed to repay to CNH. In short, at least under the facts of this case, the court finds that applying Wisconsin law would not undermine a fundamental policy of Kentucky. Accordingly, the choice-of-law provision in the guaranty is enforceable, and Wisconsin law will be used to construe and enforce it.

The parties do not dispute that the guaranty is enforceable under Wisconsin law. There is also no dispute between the parties that after Hunt Tractor breached the WFSA by failing to make

payments it owed to CNH, Scott Hunt breached the terms of the guaranty by failing to remit payments to CNH. Scott Hunt makes the same commercial reasonableness argument relating to damages as Hunt Tractor put forth. However, that argument fails for the same reason Hunt Tractor's did – Scott Hunt's failure to raise the issue prior to his response to CNH's summary judgment motion. CNH is thus entitled to summary judgment on the breach of guaranty claim, with damages in the amount Hunt Tractor owes under the WFSA: $1,815, 487.99.

### C. Breach of Fiduciary Duty - Count III

In Count III of the complaint, CNH brings a claim against Pagano for breach of fiduciary duty. Pagano has moved for summary judgment as to that claim, arguing that he owed no fiduciary duty to CNH. The Sixth Circuit has explained a fiduciary relationship as one in which "the fiduciary must make every effort to avoid having his own interests conflict with those of the principal," and if "conflict is unavoidable, the fiduciary must place the interests of the principal above his own." *In re Sallee*, 286 F.3d 878, 891 (6th Cir. 2002). "A fiduciary duty requires more than the generalized obligation of good faith and fair dealing." *Id.* Instead, a fiduciary relationship "derives from the conduct or undertaking of the purported fiduciary." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544 (Ky. 2009).

Only in "rare commercial cases is it reasonable to believe the other party will put your interests ahead of their own." *In re Sallee*, 286 F.3d at 892. In *Flegles*, the Kentucky Supreme Court noted that a "relationship between wholesaler and retailer, of course, is not one of the traditional fiduciary relationships, but is generally an ordinary arms-length market arrangement." *Flegles*, 289 S.W.3d at 552. In addition, the Sixth Circuit, applying Kentucky fiduciary law, has held that banks

do not typically have fiduciary relationships with borrowers except in special circumstances. *In re Sallee*, 286 F.3d at 893.

Here, there are no special circumstances that would render Pagano a fiduciary of CNH. Indeed, the relationship between CNH – a sophisticated creditor – and Hunt Tractor was nothing more than an ordinary, arms-length business relationship. Given that, the court sees no reason to hold that Pagano's position with respect to Hunt Tractor rendered him a fiduciary of CNH, obligated to put CNH's interests ahead of his own.[8] Nor is there any evidence of dealings between Pagano specifically and CNH that would have given rise to a fiduciary relationship. Accordingly, Pagano is entitled to summary judgment as to CNH's claim against him for breach of fiduciary duty.

### D. Fraudulent Concealment - Count IV

In Count IV, CNH brings a claim for fraudulent concealment against Pagano based on Pagano's failure to disclose to CNH that Hunt Tractor received the proceeds from the sale of equipment by Hunt Tractor to the Kentucky DOT. In order to establish a claim for fraudulent concealment under Kentucky law, a plaintiff must prove: (1) that the defendant had a duty to disclose a fact; (2) that the defendant did not disclose the fact; (3) that the defendant's failure to disclose the fact induced the plaintiff to act; and (4) that the plaintiff suffered damages as a result. *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003). Pagano argues that CNH cannot show that he had any duty to disclose to CNH that Hunt Tractor received the proceeds.

---

[8] The parties disagree about the extent of Pagano's role at Hunt Tractor. But whether he was simply a shareholder, as Pagano asserts, or an officer or director of the corporation, as CNH believes, does not make a difference. No matter the extent of Pagano's involvement at Hunt Tractor, there is no basis for finding that he was a fiduciary of CNH.

A duty to disclose facts can arise out of a confidential or fiduciary relationship between the parties, when a statute imposes such a duty, or "when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure." *Rivermont Inn*, 113 S.W.3d at 641 (citing *Dennis v. Thomson*, 43 S.W.2d 18 (Ky. 1931)). Additionally, the Sixth Circuit, interpreting Kentucky law, has stated that a duty not to conceal material facts can arise from "particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose that information." *In re Sallee*, at 896.

As noted above, there is no fiduciary relationship between CNH and Hunt. Nor has CNH pointed to any statute that would impose a duty upon Pagano to inform CNH of Hunt Tractor's receipt of proceeds from the sale of equipment to the Kentucky DOT. Instead, CNH contends that the particular circumstances here imposed a duty upon Pagano to inform CNH of Hunt Tractor's receipt of proceeds. They point out that Scott Hunt acknowledged in his deposition that, as a general matter, when Hunt Tractor sold equipment, it notified CNH of the sale so that CNH could make an automatic withdrawal of the proceeds of the sale from Hunt Tractor's account. And, Pagano acknowledged in his deposition that he was aware that Hunt Tractor had to notify CNH of sales for CNH to be able to withdraw the funds.

However, even if Hunt Tractor, as an entity, had a duty to inform CNH about the receipt of proceeds of any equipment sales, the evidence to which CNH points is not sufficient to show that Pagano himself had such a duty. There is no indication that Pagano was ever tasked with informing CNH of the receipt of proceeds. Nor does CNH point the court to anything in the record indicating that Pagano ordered anyone at Hunt Tractor not to tell CNH that Hunt Tractor received the proceeds. Accordingly, the court sees no basis for finding that there are any particular circumstances that

- 23 -

imposed a duty upon Pagano to inform CNH that Hunt Tractor received proceeds from the Kentucky DOT equipment sale. Summary judgment will be entered in Pagano's favor on that claim.

### E. Civil Conspiracy to Commit Fraud - Count V

In Count V, CNH brings a claim against Pagano for civil conspiracy to commit fraud, alleging that Pagano and Scott Hunt conspired to fraudulently conceal Hunt Tractor's receipt of the proceeds from the Kentucky DOT equipment sale. Under Kentucky law, to prevail on a claim for civil conspiracy, a plaintiff must show "an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek and Co. LLC*, 277 S.W.3d 255, 261 (Ky Ct. App. 2008) (citing *Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995)). Here, there is no evidence that Pagano and Scott Hunt reached any such illicit agreement. Instead, the evidence, taken in the light most favorable to CNH, shows only that Pagano awaited receipt of the funds and moved quickly to ensure that they were used to pay Commonwealth rather than CNH, not that he and Scott Hunt came to any decision not to inform CNH about the receipt of those funds. Without evidence of an unlawful agreement, the civil conspiracy to commit fraud claim against Pagano must fail.

### F. Preferential Conveyance - Count VI

CNH brings a claim for preferential conveyance against Pagano in Count VI. KRS § 378.060 provides that "[a]ny . . . assignment made by a debtor . . . , or any act or device done or resorted to by a debtor, in contemplation of insolvency and with the design to prefer one or more creditors to the exclusion, in whole or in part, of others, shall operate as an assignment and transfer of all the property of the debtor, and shall inure to the benefit of all his creditors, . . . in proportion to the

amount of their respective demands including those which are future and contingent.[9] KRS § 378.070 requires that "the debtor and the transferee be made defendants" to any preferential conveyance action under KRS § 378.060.

Here, any claim under KRS § 378.060 must fail because Commonwealth was not named as a defendant to that claim (or, for that matter, at all). The underlying conveyance was made by Hunt Tractor to Commonwealth, making Commonwealth a "transferee" that was required to be named as a defendant pursuant to KRS § 378.070. Further supporting the court's holding that Commonwealth was required to be added as a defendant is the nature of the remedy for a preferential conveyance claim. KRS § 378.080 states that a "court may . . . upon the terms it deems proper compel the transferee to surrender to a receiver of the court all the property in his possession or under his control, and it may make such orders respecting the property as it may make concerning attached property." In other words, a court may order the person to whom a preferential conveyance was made to place the transferred property into a receivership to then be distributed appropriately amongst all of the creditors. Where the remedy is essentially to unwind a conveyance, the parties to the conveyance must be before the court. This court will not order Commonwealth Bank to place its property into a receivership without Commonwealth Bank being made a party. As Commonwealth Bank was not named as a defendant, the preferential conveyance claim in Count VI will be dismissed with prejudice.

---

[9] In its complaint and response to Pagano's summary judgment motion, CNH does not identify KRS § 378.060 as the source of its preferential conveyance claim. However, the court is not aware of any other basis for a preferential conveyance claim under Kentucky law beyond that statute. Moreover, the allegations supporting that count of CNH's complaint strongly suggest that the claim was brought pursuant to KRS § 378.060; the allegations state that Hunt and Pagano caused Hunt Tractor to transfer the proceeds from the Kentucky DOT sale "[i]n anticipation and knowledge of Hunt Tractor's insolvency." Thus, the court addresses the preferential conveyance claim as one made pursuant to KRS § 378.060.

### G. *Fraudulent Conveyance - Count VIII*

In Count VIII, CNH brings a claim for fraudulent conveyance against Pagano.[10] CNH and Pagano have both moved for summary judgment as to this claim. Although CNH does not identify in its complaint the statutory basis for its fraudulent conveyance claim, in its summary judgment motion it identifies KRS §§ 378.010 and 378.020 as the sources of its claim. KRS § 378.010 provides:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to delay, hinder or defraud creditors, purchasers or other persons, and every bond or other evidence of debt given, action commenced or judgment suffered, with like intent, shall be void as against such creditors, purchasers and other persons. This section shall not affect the title of a purchaser for a valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

KRS § 378.020 provides:

> Every gift, conveyance, assignment, transfer or charge made by a debtor, of or upon any of his estate without valuable consideration therefor, shall be void as to all his then existing creditors, but shall not, on that account alone, be void as to creditors whose claims are thereafter contracted, nor as to purchasers from the debtor with notice of the voluntary alienation or charge.

In CNH's arguments for summary judgment in its favor and against summary judgment in Pagano's favor, CNH focuses on the language in KRS § 378.010 concerning whether a transfer or conveyance was "made with the intent to delay, hinder or defraud creditors" and the language in KRS § 378.020 concerning whether a transfer or conveyance was made "without valuable consideration therefor." However, CNH completely ignores the nature of the remedy provided by

---

[10] As with most of its claims against Pagano, CNH also brings the fraudulent conveyance claim in Count VIII against Scott Hunt. However, it appears from CNH's motion for summary judgment and proposed order regarding that motion that CNH only seeks summary judgment as to the fraudulent conveyance claim against Pagano. Thus, the court will only address the fraudulent conveyance claim as it applies to Pagano.

the statutes, which the court finds dispositive as to the viability of CNH's fraudulent conveyance claim. Specifically, the statutes provide that any transfers made with the requisite intent or without consideration are "void" as against certain creditors. In other words, the statutes authorize a court to unwind a fraudulent transaction or a transaction made without consideration. But that is not what CNH seeks to do through its claim. Rather, CNH seeks to impose liability on a third-party beneficiary of the transfer. The statutes at issue simply do not authorize third-party liability.[11]

Our sister court, the United States District Court for the Eastern District of Kentucky, recently reached the same conclusion as this court as to the remedy available for a fraudulent conveyance under Kentucky law. *Princesse D'Isenbourg et Cie, Ltd. v. Kinder Caviar, Inc.*, 2013 WL 147841 (E.D.Ky. Jan. 14, 2013). In *Princesse D'Isenbourg et Cie*, the court stated that the "proper remedy for a fraudulent conveyance claim is the nullification of the transfer by returning the property at issue back to the transferor." *Id.* at *6. The court noted that some states allow the creditor to seek compensatory damages from a transferee, but it refused to extend Kentucky law to allow for compensatory damages from a transferee because Kentucky courts had not done so. *Id.*

Further, even if compensatory damages were available against a transferee, the court is of the opinion that Pagano would not qualify as a transferee. To be sure, the court recognizes that Pagano benefitted from the conveyance between Hunt Tractor and Commonwealth, in that he was released from his guaranty and his pledged assets were released by Commonwealth. However, the supposedly fraudulent transaction was Hunt Tractor's payment to Commonwealth, not the release

_____

[11] Nor does the court see any way that it could void the supposedly fraudulent transfer in this case. The transfer was between Hunt Tractor and Commonwealth Bank. But Commonwealth Bank is not a party to this suit and Hunt Tractor, although a party to the action, is not a named defendant in the fraudulent conveyance count. The court declines to unwind a transaction on the basis that it was fraudulent or made without consideration when neither of the parties to that transaction have been named as parties to the fraudulent conveyance claim.

of Pagano from his guaranty or the release of his pledged assets. Thus, Commonwealth was the only transferee. *See GATX Corp. v. Addington*, 879 F. Supp. 2d 633, 642 (E.D.Ky. 2012) (noting that Black's Law Dictionary defines a "transferee" as "'one to whom a property interest is conveyed").

CNH cites to several cases that it believes allow for fraudulent conveyance liability against an indirect beneficiary of a conveyance. However, those cases are largely from jurisdictions that have enacted the Uniform Fraudulent Transfer Act ("UFTA"). *See, e.g.*, *Bertram v. WFI Stadium, Inc.*, 41 A.3d 1239 (D.C. 2012); *Permasteelisa CS Corp. v. The Airolite Co.*, 2007 WL 4615779 (S.D.Ohio Dec. 31, 2007); *Perlman v. Five Corners Investors I, LLC*, 2010 WL 962953 (S.D.Fla. Mar. 15, 2010). There is a key difference between the UFTA and Kentucky's fraudulent conveyance statutes. The UFTA explicitly allows for a creditor to obtain a judgment against "the person for whose benefit the transfer was made." *See* UFTA § 8(b)(1).[12] There is no similar provision in Kentucky's statutes.

In short, the language of KRS §§ 378.010 and 378.020 allow only for the remedy of voiding a fraudulent transaction or a transaction made without consideration. The Kentucky statutes do not allow for damages against a third-party beneficiary of such transactions. Pagano, a third-party

---

[12] The precise language of that provision of the UFTA is as follows:

(b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under Section 7(a)(1), the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

(1) the first transferee of the asset or the person for whose benefit the transfer was made; or

(2) any subsequent transferee other than a good faith transferee who took value or from any subsequent transferee.

UFTA § 8(b).

beneficiary of the conveyance at issue, is therefore entitled to summary judgment with regard to the fraudulent conveyance claim in Count VIII.

### H. Civil Conspiracy to Make a Preferential Conveyance and Civil Conspiracy to Make a Fraudulent Conveyance - Counts VII and IX

In Counts VII and IX, CNH brings claims for civil conspiracy to make a preferential conveyance and civil conspiracy to make a fraudulent conveyance, respectively. As noted above, Kentucky law recognizes a claim for civil conspiracy, which is defined as "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." *Smith v. Bd. of Educ. of Ludlow*, 94 S.W.2d 321, 325 (Ky. 1936). As far as this court is aware, Kentucky state courts have never considered whether claims of conspiracy to make a preferential conveyance and conspiracy to make a fraudulent conveyance are viable under Kentucky law.

However, the Eastern District of Kentucky recently had occasion to consider the viability of a claim for conspiracy to make a fraudulent conveyance. *GATX*, 879 F. Supp. 2d at 647-650. In *GATX*, the court recognized that other jurisdictions were split as to the viability of such a claim. *Id.* at 648-650. The court noted that the minority view was that such a claim was viable, while a majority of courts held that liability for a fraudulent conveyance cannot be imposed on non-transferees pursuant to a conspiracy theory. *Id.* The court in *GATX* found that Kentucky would be likely to adopt the majority approach. *Id.* at 650. It reasoned that the purpose of the fraudulent conveyance statutes in Kentucky was to put creditors back in the same position as they would have been in prior to a fraudulent conveyance, and to do that, the statutes allowed a creditor to void a fraudulent conveyance. *Id.* However, the court noted, nothing in the "plain language of the statutes or Kentucky case law suggests that a defendant can be personally liable for fraudulently conveying

property." *Id.* Thus, the court held, "a plaintiff may not circumvent the limitations of the fraudulent conveyance action by bringing a civil conspiracy claim seeking an in personam judgment." *Id.*

This court fully agrees with the analysis in *GATX*. CNH's preferential conveyance claim and fraudulent conveyance claims against Pagano are deficient because Pagano was not the transferee in the relevant transaction and the statutes do not allow for damages against third-parties. CNH cannot escape that conclusion simply by alleging that Pagano was part of a conspiracy to effect the relevant transactions. Accordingly, Pagano is entitled to summary judgment as to Counts VII and IX.

### I. Breach of Contract (Alter Ego and Piercing of Corporate Veil) - Count X

In Count X, CNH brings a claim against Pagano for breach of contract. CNH alleges that Hunt Tractor's corporate entity status should be disregard and Pagano should be liable for Hunt Tractor's debts to CNH under the WFSA. Pagano asserts that he is entitled to summary judgment on that claim.

Generally, a corporation is viewed as a separate legal entity, and a court should disturb the notion of corporate separateness "only in the rarest of circumstances." *Schultz v. Gen. Elec. Healthcare Fin. Servs. Inc.*, 360 S.W.3d 171, 174 (Ky. 2012). Kentucky law traditionally recognized two related theories by which the shareholders of a corporation could be held responsible for corporate liabilities: the "alter ego" and "instrumentality" theories. *Bear, Inc. v. Smith*, 303 S.W.3d 137, 147 (Ky. Ct. App. 2010). Recently, the Kentucky Supreme Court stated that the tests for each of those theories were "essentially interchangeable." *Inter-Tel Technologies, Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 165 (Ky. 2012). The Kentucky Supreme Court elaborated, "Each resolves to two dispositive elements: (1) domination of the corporation resulting in a loss of

corporate separateness *and* (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *Id.* In assessing the first element, Kentucky courts look to factors such as the following:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Id.* at 163-165 (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dihmantec*, 529 F.3d 371, 379 (7th Cir. 2008)). As to the second element, a plaintiff need not establish all the elements of a common law fraud claim, but it must show that some injustice beyond the inability to collect a debt from the corporation would occur if the court did not pierce the corporate veil. *Id.* at 164-165.

The court begins with the second element, because it finds it dispositive of the issue. CNH argues that observing the corporate form would sanction fraud and promote injustice because Pagano, a shareholder, usurped the corporate form for his own benefit, i.e., to pay off the loans he had guaranteed and for which he had pledged his assets. In support of its argument, CNH states that Scott Hunt was the president of Hunt Tractor, and thus was the one with actual authority to pay off the Commonwealth loans and to close the line of credit. Moreover, CNH notes, Scott Hunt did not want to close the Commonwealth loans. Yet Pagano, who claimed he had no control over the finances of Hunt Tractor, ordered the loans paid off. CNH further notes that Pagano was aware that paying off the Commonwealth Bank loans would render Hunt Tractor unable to continue business. And, CNH argues, the reason why Pagano ordered the Commonwealth loans to be paid off is

apparent: it would allow him to obtain a release from his guarantee and to have his pledged assets released.

However, despite CNH's protestations over Pagano's orders for Hunt Tractor to pay off the Commonwealth loans so that he extricate himself from potential liability to Commonwealth, the court is of the opinion that CNH has not established that observing the corporate form would sanction fraud or promote injustice. That is because CNH had an available remedy in this case: to bring a preferential or fraudulent transfer claim and void the conveyance.[13] In that regard, at bottom, CNH's contentions about the damage Pagano caused to CNH resolve to nothing more than CNH's belief that it had a priority interest in the proceeds of the Kentucky DOT equipment sale, but Hunt Tractor, at Pagano's direction, used them to pay off a different creditor because doing so would benefit Pagano. In light of the fact that Hunt Tractor had an available remedy for the supposedly improper conveyance from Hunt Tractor to Commonwealth Bank, there would be no injustice in declining to pierce the corporate veil in this case. *See* 1 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA ON THE LAW OF PRIVATE CORPORATIONS § 41.34 (1999) ("Where attempted transfers of corporate assets may be avoided as fraudulent conveyances, disregard of the corporate entity is unnecessary." (footnotes omitted)). Because piercing the corporate veil would not be proper in this case, the breach of contract claim against Pagano in Count X will be dismissed.

### J. Conversion - Count XI

In Count XI, CNH brings a claim against Pagano for conversion. Both Pagano and CNH

Under Kentucky law, a plaintiff must prove the following elements to establish a claim for conversion:

---

[13] Of course, CNH brought such claims in this action, but not against the proper party, which was Commonwealth Bank. However, CNH's failure to bring the claims against the proper party does not change the court's analysis. The point remains: CNH had an available remedy and thus there is no injustice in failing to pierce the corporate veil.

> (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.

*Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005) (quoting 90 C.J.S. TROVER AND CONVERSION § 4 (2004)).

Here, without deciding whether the plaintiffs can establish any of the other elements, the court finds that the evidence as to the third element is lacking. The property at issue (i.e., the property for which CNH claims it had title and the right to possess) were the proceeds of the Kentucky DOT equipment sale. Pagano, as an individual, never exercised control over those proceeds. The proceeds were within the control of Hunt Tractor, which used them to pay Commonwealth Bank. While the evidence put forth by CNH shows that Pagano was ordering the loans to be repaid, it is clear that he did so on behalf of Hunt Tractor.[14]

CNH argues that Pagano exercised dominion over the proceeds from the Kentucky DOT equipment sale because he benefitted from the conveyance at issue by having his obligations to Commonwealth Bank released. However, CNH cites to no Kentucky case for such an expansive interpretation of what it means to exercise dominion over funds. Without any evidence that Kentucky courts would interpret the phrase "exercised dominion over the property" to mean "benefitted from another's exercise of dominion over the property," the court will not extend

---

[14] It should be noted that CNH advances no piercing the corporate veil argument for the conversion claim, instead choosing to assert such a claim directly against Pagano for his own individual actions. In any event, as discussed in the previous section, the court believes that this is not one of the rare instances for which the corporate veil should be pierced.

- 33 -

Kentucky law in that manner. The court will enter summary judgment in Pagano's favor as to the conversion claim.

### K. Punitive Damage - Count XII

In Count XII, CNH claims that it is entitled to punitive damages from Pagano because Pagano "acted with reckless disregard of the rights of CNH and with fraud, malice and oppression in its acts and material omissions toward CNH." As set out above, all substantive claims against Pagano will be dismissed. Thus, Pagano is entitled to summary judgment on the request for punitive damages in Count XII.

### III.

In conclusion, the court will grant CNH's motion for summary judgment as to Count I, for breach of contract against Hunt Tractor, and Count II, for breach of guaranty against Scott Hunt. However, the court will deny CNH's motion for summary judgment as to Counts VIII and XI. The court will also deny Scott Hunt's motion for summary judgment. The court will grant Pagano's motion for summary judgment in full, and all claims against him will be dismissed.[15]

A separate order will issue in accordance with this opinion.

March 25, 2013

**Charles R. Simpson III, Senior Judge**
**United States District Court**

---

[15] After the entry of the order accompanying this opinion, the only claims that will remain in this case are those against Scott Hunt for breach of fiduciary duty (Count III), fraudulent concealment (Count IV), civil conspiracy to commit fraud (Count V), preferential conveyance (Count VI), civil conspiracy to make a preferential conveyance (Count VII), fraudulent conveyance (Count VIII), civil conspiracy to make a preferential conveyance (Count IX), conversion (Count XI), and punitive damages (Count XII).

- 34 -